23-1944. Counsel, can you read? Yes, Your Honor. Thank you. Okay. You've got three minutes for rebuttal. Is that right? That's correct, Your Honor. Okay. You may begin. Good morning. May it please the Court. The Board committed several substantive errors in this case, but I'd like to start and focus on the most recent one, which is a case in which the plaintiff is accused of having procedural error that affected the entire scope of the proceeding, and that is the Board's treatment of Columbia's Certificate of Correction, Vista Claims 18-20 of the 867 Act. So on that one, suppose we were to say we clarify that the corrected claim was not part of this proceeding. What more do you have to say about that subject? That would be perfectly fine for us, Your Honor. That is the remedy we're requesting. The problem with this case, Your Honor, is that we can't unravel the web, given that the Certificate of Correction is already issued. So as far as we're concerned, we're trying to mitigate the prejudice going forward and to clarify. Your Honor, you would be able to raise in some other proceeding, perhaps in the — there's a pending infringement case. There is, Your Honor. That's true. Did you file it then after the corrected? One case involving only the corrected claims, Your Honor.  And in that, presumably, it could be challenged whether that correction was legit. That is correct. And whether the corrected version was, you know, claimed unpatentable subject matter. That is also correct, Your Honor.  So that is the narrowest form of relief that we believe is appropriate for the Board's APA violation. And just — I do want to be clear, though, Your Honor, that there are multiple forms of prejudice here. I think, Judge Toronto, you appreciate that. One is that we have no doubt in our mind that Columbia will argue that we are now stopped from challenging the validity of the corrected claims in district court, given that the Board addressed them in its decision. Of course, we dispute that we would be stopped as the case currently stands, but if the court were to clarify that those claims were not at issue, that would take the prejudice off the table. I'm happy to answer any other questions about the APA issue, if Your Honors have any. Otherwise, I can turn to one of the substantive issues. Won't you do that? Yes, Your Honor. I will turn to our indefiniteness challenge to original claims 13 and 14. So these claims require that each extension flange, which is a three-dimensional component having bends, lies in a two-dimensional plane. Now, we explained at length in our briefing why in this particular case it doesn't make sense to say that a three-dimensional component lies in a two-dimensional plane without specifying So I guess the thought that I had about that, which I'd like you to respond to, is if lying in has a mathematical meaning, not only would that not make sense in this case, it could not conceivably ever make sense. No three-dimensional object lies in a two-dimensional object. And therefore, it's perfectly clear that a mathematical use is not what is being deployed here. It is instead a use in this field for something else, like the Board said, what orientation and something else, I forget what the second word was. Yes, orientation and configuration of one component relative to another. That's what the Board said. Yes, the problem with that, Your Honor, is that the orientation of the extension flange relative to the base plane is tied to how much of that component lies within the intersecting plane. And I think we showed this at page 17 of our gray brief. We have an example that shows that you cannot adequately specify the orientation of a three-dimensional component that intersects a plane that is itself perpendicular to a base plane without indicating how much of that three-dimensional component and which surface of that component lies in the plane. And we know that's the case in this particular context, Your Honor, because in every other limitation where the inventors required a 3D component to lie in a plane, the inventors specified that it was a particular surface. We see that in the base plane limitation of Plane 1, but we also see that in Planes 7, 12, 20, and 21. So there is an internal inconsistency in this particular patent as to how the inventors described the orientation. This is all just an indefinite misargument, right? That's correct, Your Honor. So we're not looking for anything more than whether a relevant artisan reasonably discern the boundaries of this. It doesn't seem to me to be defeated by the range of possibilities for something that is, in normal parlance, almost entirely planar. Well, the problem with that premise, Your Honor, that the flanges are entirely planar, is that the Board expressly rejected that contention by Columbia at Appendix pages 35 to 37. The Board correctly, in our view, said that the flanges need not be thin, relatively flat, and substantially planar. It then turned around at Appendix 38 and narrowly construed the claim to require that the entirety of this flange lie within a plane. The only way that construction could possibly be correct is if, indeed, the flanges are substantially planar. And that's a problem. The Board's construction is inconsistent with its own fact findings. Now, the Board also rejected outer alternative construction that required any portion of the extension flange to lie within the plane because the Board said that that construction was too broad. So, if we accept the Board's findings in face value, we're left with a broad construction that the Board rejected and a narrow construction that is inconsistent with the Board's own fact findings, and we're left at square one trying to determine what the claim means. The problem here is that the Board accepted the premise that extension flanges can be multi-planar, and without additional specificity in the claims, a person's familiar would be unable to determine whether a multi-planar flange lies within the scope of the claims, which is a hallmark of indefiniteness. We see, and this is what, this is all in the context between, of a essentially planar wall, stuff slightly, you know, two other panels are going to be stuck in for fire prevention. The hanger has to have a essentially planar back to it, and you're just talking about the cross pieces. Does that kind of connect the back to the, the back of the hanger to the ultimate back that's going to connect to the wall? That's correct, Your Honor. Do you have any doubt about what would constitute a, whatever the term is here? An extension flange lying in an extension flange. Yes, precisely because all agree that the extension flanges can be multi-planar. I think the primary. I'm sorry, and what does multi-planar mean? Meaning that the extension flange can comprise multiple components, each lying in different planes. I think a good example of that, Your Honor, is the Tsukamoto reference that we used to challenge Claim 16, but which the Board never reached. That prior reference has an inclined portion and a connection portion that is perpendicular to that component. Is that in the appendix? It is, Your Honor. That would be an appendix. You have a figure in your briefing, too. We do as well. Yeah, the appendix page would be Appendix 1890, Figure 4. We also have that figure reproduced in our briefing as well, both, I believe, the blue and the gray brief. The inclined portion 3B is one plane of the extension flange. The triangular portion there, which is labeled 3D prime, lies in a different plane, and those two components are at right angles. Nobody disputes that collectively those components perform the function of extending through the sheathing from the channel shape portion to the back flange, and yet those two components lie in different planes. That's part of the problem, is that the Board's fact findings clearly accept that a hanger like Tsukamoto could fall within the planes, and yet the Board rejected or construed the plane in such a way as to make that impossible. And again, we're left with uncertainty as to how much of a surface in Tsukamoto's extension flanges must lie within the plane in order to satisfy the limitation. The final point I'll make on this, Your Honor, is that the claim originally did, when it was first filed, specify a particular surface that must lie in the plane, the major surface. The examiner during prosecution rejected the claim as indefinite because the word majors is a degree. But rather than fixing the problem, the applicant made it worse by simply removing any reference to a surface. And so if the claims were indefinite before, they are certainly indefinite after. They withdrew the indefiniteness rejection after that amendment, right? After the amendment, Your Honor, yes. That is correct. So I guess in the examiner's mind, who was laser-like focused on the issue, the examiner approved the claim for indefiniteness purposes. Well, that's correct. But the examiner was focused on the word major and not necessarily on the word surface. And given that every other limitation reciting 3D components lying in a 2D plane do specify the surface, I think there is an internal inconsistency here that is missing from all those other prior references on which Columbia and the Board relied. I will just say one thing about Substitute Claim 32 and the enablement issue. This claim is broad enough to cover a hangar without top flanges, but the specification describes and depicts only hangars with top flanges. And the problem is that Columbia's own expert testified in Appendix 3037 and 3039 that the 867 Patton hangar simply, quote, would not work without top flanges and would be, quote, inoperable. Our expert agreed with that testimony, which should have ended the inquiry. Isn't that expert really referring to the embodiment in Figure 2, which wholly relied on the top flanges disclosed to do the connection? And so, of course, if you remove those top flanges from the figure, then the thing would fall down. Then there would be no means of connecting to the wall. Well, yes, Your Honor, but that's the only embodiment that is disclosed in the Patton. All of Figures 1 through 14a disclose a single embodiment, and it is undisputed that that embodiment is covered by Claim 32. There's no hint in the Patton. Can I just ask on that? So if I said to you, when I asked, if I asked my clerk, clerks, how would you hang this without the top, it was under 10 seconds that somebody said, use the back to nail it in to the wall. So, Your Honor, a couple of things, a couple of responses to that question. Tell me if it's irrelevant what I mean. Well, it is, Your Honor, because the inquiry is whether the specification enables not just back-mounted hangers generally, but whether it enables the ability to back-mount this specific hanger. And the reason you wouldn't be able to back-mount this specific hanger... Can't get the hammer between those things? That's one reason, Your Honor. Both experts agreed on that point. And that's only if you install the hanger first before the drywall. If you install the drywall first, as is clearly contemplated by the Patton in Column 7, you would have to drill through or nail through the drywall itself to get to the back flanges, which would defeat what Columbia says is the entire purpose of the invention. So even though prior hangers could be face-mounted, it's undisputed, both experts agreed that this particular hanger could not. And so we think we're on all fours with all the motives. Why would that defeat the purpose? You just need... So according to... ...to drill it an inch or so longer. According to Columbia, the purpose of this patent, the crux of the invention, is minimizing the cutouts in the drywall. And so if you had to nail through the drywall into the back flange... Really, the nail-filled nail hole is a cutout? Yes, Your Honor. That is correct. So we would ask that the Court reverse the enablement issue. I'm happy to answer other questions. Otherwise, I will save my time. Okay. Thank you. Thank you. Good morning, Your Honors. Yes. Scott Edson, along with my colleague, Mr. John Schrader, on behalf of Columbia Insurance Company. I want to jump in and address a few issues that Judge Toronto raised. First, on the APA issue, I think the question was, if we clarify that the corrected claim was not part of the proceeding, then do we need to do anything else? Well, Simpson can't have it both ways here, Your Honor. It's not having the other way yet. Very good. But if the Court was to say, for instance, that claims 18 to 20 in corrected form were not before the Board and the Board shouldn't have opined on that, the Board also opined in the same manner on the corrected claims 5 and 17. And so, therefore, the decision that Simpson wants to take advantage of and keep, the success that it had with those corrected claims would also have to be discarded. It can't have it both ways. Why would that be if it turns out that there was no argument made by the petitioner challenging the validity of the corrected claims and the Board made it clear that it wasn't committing itself at the institution as to whether the corrected claims were in play. They could be. They could not be. But then we read the final written decision as saying, you know, if it was before us, we would probably say it's okay. But the inference there is that it wasn't actually before the Board, so the Board wasn't opining on it. At the same time, for the other claims, the other corrected claims, they were being disputed in the petitioner reply and back and forth between the parties, and so it was a contested issue in front of the Board, and then the Board addressed the merits. Why would that be a wrong way of just viewing the entire proceeding? Well, it goes to the differences in the challenges that they had between claims 18 and 20, which they didn't lodge a 102 or 103 challenge to. They just had the sole 112 challenge to. They had no backup grounds. On the other claims, they had 102, 103 challenges, and as you know, Your Honor, they did argue both the pre-corrected and corrected claims in the reply to the Patent Owner's Statement at Appendix 790 and 791, and the Board addressed those corrected claims. Claims 5 and 7? Yes, Your Honor. Right, but not for these claims? Not for claims 18 and 20, no, Your Honor. Right. There was an indefinite mischallenge, and Simpson had every opportunity, if it wanted to further address it, to raise the issue. At no point in time did they seek accommodations from the Board to raise any additional argument related to those claims. They had a 112 argument related to an antecedent basis issue that was mooted by the Certificate of Correction. Simpson acknowledged that. They did nothing further. They sat on their hands. They made a strategic decision to not do anything. Well, they probably made a strategic decision not to petition for every single claim in the patent. That doesn't mean that they're stopped from later challenging every non-petitioned for claim in the patent, right? Well, not necessarily, Your Honor. What they can't do is sit on their hands and not do self-help when they're fully aware that the issue is before the Board. When Columbia puts it at issue at every turn, both in Columbia's briefing and communications to the Board, they can't just sit back and say, we only had a 112 argument that was mooted by the Certificate of Correction, and get a ruling that they don't like later, and then come back to this Court and ask it to be sent back. That's the problem that they've got, Your Honor. So what is it that you're looking for here? You want the Court to conclude that the Board definitively made a ruling on the corrective claims 18 to 20? We want the Court to affirm the PTAB's ruling. And, Judge Chen, if your question is, did the Court have both sets of claims before it, it is our opinion that they did under 255. But did the Board actually decide and pass on the corrective claims? That's the question. I think they did, Your Honor. If you look at their analysis and their rationale. Do you think that the question of estoppel that would come up depends on whether the Board ruled on the corrective claim, or just whether it was in front of them, even if not ruled on? The question of estoppel in the District Court? Yes. So if the question is directly, would MITAC in Columbia assert estoppel in the District Court, my colleague is right, we would. Simpson had the chance to litigate these claims at the PTAB. Okay, that's an interesting point. Now, the specific question I asked you, in your view, does estoppel depend on whether the claim, the corrective claim, was adjudicated by the Board, or just that it could have been adjudicated in the proceeding, even if this is the second alternative, it wasn't? I think it's estopped if they raised or could have raised it. And Simpson could have raised it by seeking additional relief, additional accommodations from the Board, which they did not do. So I'm not sure it necessarily hinges on the ruling one way or another. It hinges whether they could have raised it, and they didn't do that, Your Honor. That's what the estoppel statute provides. Did the Board conduct a substantive analysis of claims 18 through 20? Pre-corrected and corrected, Your Honor. If you read the opinion in the appendix, they give a full analysis of claims 18 to 20 pre-corrected, and then they say, as is in the briefing, our analysis is the same pre-corrected versus corrected. Yes, Your Honor. They didn't quite say it like that, did they? They say we find the term Joyce provides an unseated basis for the term structural component. We would reach the same result regardless of whether the certificate of correction has effect in this proceeding. Correct, Your Honor. I think we're on the same page there. Jumping to the merits of the indefinite misargument on claims 18 to 20, the term Joyce is used interchangeably for a structural component. I think Simpson acknowledges that if you look at the reply brief, footnote 4, page 12. Do you agree that the claim is restricted to Joyce? No. It's a structural component. A Joyce is interchangeable with structural components, so when you say restricted to Joyce, I guess it's if we have the same understanding of Joyce that it's used as an umbrella term for a variety of structural components, then I would say yes. No, Joyce is one type of structural component. Then I would say no. No, the claim refers to a structural component, a Joyce. If you're saying that a Joyce is a type of structural component which we disagree with, we think it's interchangeable with, and I think Simpson acknowledges that when they say the term Joyce is used as an umbrella term for a structural component. So I think that's where we have a disagreement is the premise of whether a structural component is a species, so to speak, or a Joyce is a species of a structural component. We disagree with that. Where did he say Simpson says something about Joyce? Reply brief, footnote 4, they acknowledge, I believe it's on page 12, they acknowledge that the term Joyce is used as an umbrella term for structural connectors. Columbia, let's see, points out that Simpson's product literature, this is from their product literature, is that what you're relying on? I believe so, Your Honor. And to the point about the claim, Simpson acknowledges that the term Joyce. They say a structural component is broader than a Joyce. And then. Yes, and then. The fact remains. Right, the first part of the footnote says Columbia points out that Simpson's product literature refers to certain structural components using the umbrella term Joyce. And then they essentially contradict their own literature and they say, well, but we say that. Let's assume for a moment that structural component means a Joyce, but it can mean other kinds of structural components like a truss. Okay. And so therefore a structural component is broader than Joyce. Then I guess my question is why wouldn't the claim be restricted to Joyce and therefore exclude trusses because you've introduced the term Joyce in the preamble and then all of the subsequent references in the body to a structural component are referring back to the Joyce for antecedent basis. I think, Your Honor, that that question hinges on the premise of whether the preamble there is limiting. And it is not. Simpson acknowledges that the preamble is not limiting. If you look at the petition, page 293, you say that the Joyce frame wall, the upper plate studs, and the sheathings of claim 16, from which 18 to 20 depend, are not positively recited. Was it your position that the preamble is limiting? No, Your Honor. You never said the preamble is limiting. I don't believe so, Your Honor. And then Simpson says that the Joyce or structural members cited in the preambles are merely in intended use. That's at the appendix of page 261. But you urged the board to rely on the Joyce as antecedent basis for a structural component. Did you not? We did. We did, Your Honor. So you can't tell me to ignore the preamble then. I can tell you that it's not limiting. We made a typographical correction using the certificate of correction to something that is not limiting in the preamble. What if the preamble had said daughter and then the body of the claim over and over again said the child, the child, the child? Wouldn't the references to child in the body be referencing the daughter? It would depend on the other aspects of the claim, Your Honor. Let's assume there are no other aspects. Your Honor, then it probably could. So then it would be a daughter-based claim, right? Wouldn't include sons. Your Honor. Okay. Can you talk about claims? We can talk about claims. Yes, Your Honor, we can. Simpson's main problem here is that the definition doesn't fit with their preferred piece of prior art. Specifically, it's pretty clear that base plane and extension flange plane are used differently by the patentee in this case. When the patentee wants to define a plane having a surface like base plane, it does so in the claim. When you look at within claim one, it talks about the top surface of the support member. When it's using extension flange plane, it's using it completely differently. It's using it to show orientation. And I think the best way to address some of the diagrams that have been in the briefing and the example that my colleague illustrated here is think of a – which Simpson, by the way, I think they confused the term intersect with laying in a plane. And, Judge Ferranto, I think you were right earlier. One of your clerks in 10 seconds on enablement said you would just nail the back planges here. That's the other point. It is. But it's analogous here in that when you read the claim in the context of the entire claim, when it's lying generally perpendicular, going up and down, you understand the orientation of the extension flange extension portion with the two extension flanges in the extension flange plane. Even if the extension flange doesn't have to be flat, even if it could have a true bend in it so that portions of it you would describe as having different orientations from each other? If we're talking about the minor angles and the top portion there where it bends around? Any bend will do. Your Honor, I think any – Even assume it's not a curve, although at some micro level they'll all be curves, but something more like what you would describe as an angle? I think the board did address that, Your Honor, at appendix page 37. In a way that I found hard to understand. I apologize for that. It seemed to be trying to fit this three-dimensional object into something that wasn't quite a plane but, you know, like a table. It's designed to illustrate a general orientation, which is what it does. And what the board did find persuasive when you're talking about lying in a plane is Simpson's art for hangar technology, when they use the exact same term to define various components of their hangars as lying in a plane. And so when Simpson prosecutes and pursues its own patents, one of ordinary skill in the art understands what it means to lie in a plane when it's defining the orientation of those products. But when my tech does it – Are you accepting now that the board was right to reject the – There was a proposal about the – Generally planar. Generally planar or something like that. Your Honor, we disagree with the board. It's not up for appeal here, so we didn't take issue with it. I understand the board's position on that, but we certainly don't agree with it. Your Honor, I see that I'm at time. You're out of time. Thank you very much. And thank you all for your consideration. Mr. Kruger, you've got 30 minutes. Thank you, Your Honor. I will begin where my colleague on the other side left off, and that is the extension flange limitation. Judge Torano, you are correct. This is like fitting a square peg into a round hole, because in all those other prior references that my colleague referred to, the components of the issue were relatively flat and planar. Here the board rejected that premise, and so with that premise rejected, Columbia's argument fails. Turning to the EPA issue, my colleague suggested that we sat on our hands and didn't try to seek any accommodations for Columbia Certificate of Correction. That is incorrect. At Appendix 7723 and 7725, we requested prior to institution permission from the board to brief the effect that the Certificate of Correction would have on the proceeding. The board at Appendix 491 rejected those requests and made very clear that we wouldn't be heard on the issue. And this is really the crux of the EPA violation is that having – But getting to the specific question of what you did in your reply, you did in your reply challenge the patentability of corrected Claims 5 and 7, and so therefore you knew how to do that, and you had the opportunity right then and there to make your patentability challenge to corrected Claims 18-20, but you sat on your hands, and I'm trying to understand why you did one thing for one set of corrected claims and did a different thing for the other set of corrected claims. Can you explain that? Yes, Your Honor, because the corrections to Claims 5 and 17, which are the other set of claims to which Your Honor is referring, did not meet our indefiniteness or VIN description arguments. The board agreed with those arguments, notwithstanding the Certificate of Correction. Now, the board also invalidated those claims based on prior art. The difference with Claims 18-20 is that we – by Columbia's omission, their admission, rather, their correction rooted and nullified our indefiniteness argument. We weren't allowed to brief whether the COC was even in effect, and therefore we were bound by a petition that no longer addressed the claims that in Columbia's telling word issue. Our hands were tied. You could have made a 102 or 103 argument. No, Your Honor. You didn't. We couldn't because we requested permission to brief that issue. The board denied that request. The only way we could have raised a 102 or 103 argument on the corrected claims is if the board required Columbia to go through the Motion to Amend procedure, which is supposed to govern PGRs. But the board didn't do that, and that's part of the prejudice here, is that the board didn't afford us any accommodations to cure the prejudice. As this court said in Honeywell, the board was required to do. There's litigation over the validity of the Certificate of Correction, right? Not yet, Your Honor. Not yet, okay. That's right. Of course, we preserve our ability to challenge that certificate down the road if and when we get there. And I know this is also getting ahead of ourselves, but your answer to an estoppel assertion would have to be that you couldn't have presented the Certificate of Correction, right, because of the wording of the estoppel provision, and is that right? And then your argument is we tried and they said no, and that's enough or couldn't? Yes, Your Honor. I mean, there can be no dispute that we couldn't address the corrected claims at the time we filed our petition because those claims didn't exist. For that reason, we would argue, of course, that there is no estoppel, even as the case currently stands. But as my colleague on the other side admitted, they do plan to argue estoppel and we need to cure that prejudice. Thank you. Thank you for having me.